EMLEE EQUIPMENT LEASING CORPORATION *v.*
WATERBURY TRANSMISSION, INC., ET AL.
(11105)

O'CONNELL, FOTI and LANDAU, Js.

Argued February 9—decision released June 1, 1993

*Frederick W. Krug,* for the appellant-appellee (plaintiff).

*Salvatore C. Agati,* for the appellee (named defendant).

*Alvin Rosenbaum,* for the appellee-appellant (defendant Marvin S. Mann).

O'CONNELL, J. This case arises from an equipment lease executed by the plaintiff and the defendant Waterbury Transmission, Inc., and personally guaranteed by the defendant Marvin S. Mann, the president and sole stockholder of Waterbury Transmission.[1] Following a trial to the court, judgment was rendered for the defendants on the complaint and for the plaintiff on a counterclaim filed by Mann.

The plaintiff appealed, claiming that the trial court improperly (1) found the remedies provision of the lease to be unconscionable, (2) failed, in the alternative, to limit the unconscionable portion of the remedies provision, and (3) refused to award interest and attorney's fees. Mann filed a cross appeal claiming that the trial court improperly (1) found that he had abandoned his counterclaim, and (2) found that there was insufficient evidence to support the counterclaim. We reverse the judgment on the complaint and remand the case for further proceedings. We affirm the judgment on the counterclaim.

The following facts are necessary to decide this appeal. In early 1984, Waterbury Transmission decided to expand its automobile transmission business to include the installation and repair of mufflers. The new business required acquisition of a pipe bending machine. As president of Waterbury Transmission, Mann contacted Custom Muffler Specialists, Inc., of Nashua, New Hampshire (Custom), a distributor of pipe bending machines. Thereafter, a representative of Custom came to the defendants' place of business and, on March 5, 1984, Waterbury Transmission entered into

---

[1] Mann was no longer associated with Waterbury Transmission, Inc., at the time of trial.

a contract with Custom for the purchase of a muffler pipe bender for $15,980. As part of the same transaction, Waterbury Transmission paid a $1500 deposit and also entered into a distributorship agreement with Custom.

Before the equipment was delivered, the plaintiff contacted Mann and discussed the advantages of leasing the equipment instead of purchasing the equipment outright. Mann decided that leasing was the better way to go and, on April 24, 1984, Waterbury Transmission, acting through Mann as its president, signed a lease with the plaintiff to make sixty monthly rental payments of $398 in addition to a $1500 deposit already paid. Mann also signed a personal guarantee.

The plaintiff is solely in the leasing business and does not maintain an inventory of equipment for leasing. The plaintiff's practice is to purchase equipment designated by a lessee and then to supply the equipment to the lessee subject to a written lease. The lease at issue here is a standard contract used by the plaintiff in all of its equipment leases. The plaintiff borrowed $14,388 from Citibank and executed a promissory note containing an acceleration clause that permitted Citibank to declare the entire unpaid balance of principal and interest due upon default in payment of any monthly installment. The agreement between the plaintiff and Waterbury Transmission called for Waterbury Transmission to make its monthly rental payments to Citibank.[2]

The lease further provided for five "events of default." The only one relevant to this appeal was the

---

[2] The application of the monthly payments was as follows:

| | |
|---|---|
| Applied to plaintiff's note with Citibank | $345.07 |
| Applied to plaintiff's cash flow account | 52.93 |
| | $398.00 |

failure to pay rent or other required payments.[3] The lease provided for various remedies in the event of default, including provisions that permitted the plaintiff to declare all unpaid sums immediately due and payable and to demand 10 percent interest on the unpaid balance together with legal fees and costs.

Waterbury Transmission defaulted after its December, 1984 payment, having made only eleven of the sixty payments required, including credit for the $1500 deposit. A check issued by Waterbury Transmission on June 17, 1985, to cover its January, February and March, 1985 payments was returned by the bank for insufficient funds.

As a result of Waterbury Transmission's seven month default, Citibank accelerated the balance of the plaintiff's note, thereby requiring the plaintiff to pay Citibank the full unpaid balance. On July 17, 1985, the plaintiff accelerated the payments under the lease and demanded the full amount due. Neither Waterbury Transmission nor Mann, as guarantor, paid any portion of the amount demanded. Waterbury Transmission remained in possession of the equipment, which the defendants now claim is defective and inoperative.

The plaintiff commenced this action seeking $19,502 (forty-nine months rental payments at $398) plus interest at 10 percent from the date of default and attorney's fees and costs. Both defendants filed special defenses alleging that (1) the pipe bending machine was defective and, therefore, there was a total failure of consideration and (2) the terms of the lease were unconscionable and violative of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.

---

[3] The other four events of default were (1) failure to perform covenants for ten days after written notice from lessor, (2) attempts to sell, encumber or sublet the equipment, (3) insolvency or bankruptcy, and (4) an adverse material change in lessee's financial condition.

(CUTPA). Waterbury Transmission also filed a special defense alleging that the plaintiff failed to mitigate its damages.

Mann filed a counterclaim asserting that the plaintiff violated CUTPA in that the plaintiff (1) provided the pipe bender knowing that it was obsolete and would fall into disrepair and (2) represented that Waterbury Transmission would have the benefit of any manufacturer's warranties when no such warranties existed.

The trial court found that the lease was unconscionable under General Statutes § 42a-2-302 (1)[4] and rendered judgment in favor of both defendants on the complaint and rendered judgment for the plaintiff on the counterclaim on the grounds that (1) the counterclaim had been abandoned by Mann and (2) Mann had failed to sustain his burden of proof. The plaintiff appealed and Mann cross appealed. Additional facts are included in the discussion of individual claims.

## I

### THE PLAINTIFF'S APPEAL

The plaintiff first claims that the trial court improperly found that the default and remedies provisions of the lease were unconscionable.[5] We begin our analy-

---

[4] General Statutes § 42a-2-302 (1) provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause to avoid any unconscionable result."

[5] Although this is a lease and not a contract for the sale of goods, the standards set forth in article 2 of the Uniform Commercial Code have been recognized by our Supreme Court as being applicable to a claim of unconscionability involving a lease. See *Texaco, Inc.* v. *Golart,* 206 Conn. 454, 461–62, 538 A.2d 1017 (1988). This court has done so as well. See *Edart Truck Rental Corporation* v. *B. Swirsky & Co.,* 23 Conn. App. 137, 579 A.2d 133 (1990). Moreover, most courts that have addressed the issue of whether article 2 applies to commercial equipment leases have assumed

sis of this claim by considering the standard of review. Because unconscionability is a matter of law to be decided by the court; *Cheshire Mortgage Service, Inc.* v. *Montes,* 223 Conn. 80, 88, 612 A.2d 1130 (1992); *Hamm* v. *Taylor,* 180 Conn. 491, 493, 429 A.2d 946 (1980); *Fairfield Lease Corporation* v. *Romano's Auto Service,* 4 Conn. App. 495, 498, 495 A.2d 286 (1985); *Iamartino* v. *Avallone,* 2 Conn. App. 119, 125, 477 A.2d 124, cert. denied, 194 Conn. 802, 478 A.2d 1025 (1984); see General Statutes § 42a-2-302; our review on appeal is not limited by the clearly erroneous standard; *Texaco, Inc.* v. *Golart,* 206 Conn. 454, 461, 538 A.2d 1017 (1988); *Iamartino* v. *Avallone,* supra; but is, rather, a plenary review. *Cheshire Mortgage Service, Inc.* v. *Montes,* supra. We defer, however, to the trial court's factual findings that underlie the determination of unconscionability unless they are clearly erroneous. Id.; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980); *Iamartino* v. *Avallone,* supra.

In the present case, the trial court determined that the accelerated payment clause of paragraph nine[6] was

---

that it does. J. Schmitt, "Unconscionability and Disclaimer of Warranties in Lease Agreements Under the Uniform Commercial Code," A.B.A. Committee on Commercial & Banking Litigation, Fall 1992, pp. 2, 3. In the present case, the trial court applied the principles of the Uniform Commercial Code and the parties have briefed it accordingly. We will, therefore, measure the provisions of the lease against the relevant Uniform Commercial Code principles.

[6] Paragraph nine provided:

"REMEDIES. Upon the occurrence of any event of default and at any time thereafter Lessor may, in its sole discretion, do any one or more of the following: (i) upon notice to Lessee, terminate this Lease; (ii) declare all sums due and to become due hereunder for the full term of the Lease immediately due and payable; (iii) demand that Lessee return all Equipment to Lessor in accordance with Paragraph 13 hereof; (iv) enter the premises where such Equipment is located and take immediate possession of and remove the same, without liability to Lessor or its agents for such entry, or for damage to property or otherwise; (v) sell any or all of the Equipment at public or private sale, with or without notice to Lessor or adver-

punitive and, therefore, void. See General Statutes § 42a-2-718.[7] The court further determined that the combination of this paragraph and the provisions of paragraph four[8] (disclaimer of warranties), paragraph

tisement, or otherwise dispose of, lease to others or keep idle such Equipment, all free and clear of any rights of Lessee and without any duty to account to Lessee for such action or inaction or for any proceeds with respect thereto; (vi) by written notice to Lessee, demand Lessee (and Lessee agrees that it will) pay to Lessor (as liquidated damages for loss of a bargain and not as a penalty) on the date specified in such notice an amount (plus interest thereon at the rate of 10% per annum from said date to the date of actual payment) equal to all unpaid rent payments (and any renewal or purchase options) which absent a default would have been payable by Lessee hereunder for the full term hereof; or (vii) excise any other right or remedy which may be available to it under the Uniform Commercial Code or any other applicable law or proceed by court action to enforce the terms hereof or to recover damages for the breach hereof. In addition, Lessee shall be liable for all legal fees and other costs and expenses resulting from the foregoing defaults or the exercise of Lessor's remedies, including placing any Equipment in the condition required by Paragraph 13 hereof. If this Lease be deemed at any time to be one intended as security then Lessee agrees that the Equipment shall secure, in addition to the indebtedness set forth herein, all other indebtedness at any time owing by Lessee to Lessor. No remedy referred to in this paragraph is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity. No express or implied waiver by Lessor or any default shall constitute a waiver of any other default by Lessee or a waiver of any of Lessor's rights. To the extent permitted by applicable law, Lessee hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or otherwise use any Equipment in mitigation of Lessor's damages as set forth in the paragraph or which may otherwise limit or modify any of Lessor's rights or remedies under this paragraph.''

[7] General Statutes § 42a-2-718 provides in pertinent part: "(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.''

[8] Paragraph four provided:

"WARRANTIES. Lessee acknowledges that it has made the selection of each item of Equipment based upon its own judgment and expressly disclaims any reliance upon statements made by Lessor. LESSOR MAKES NO EXPRESS OR IMPLIED WARRANTIES INCLUDING THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE WITH

six[9] (lessee must pay all taxes), paragraph twelve[10] (lessee must pay and maintain insurance) and paragraph fifteen[11] (no cancellation for any reason; all sums are due absolute and unconditional) rendered the lease unenforceable.

We evaluate this lease with the recognition that the purpose of the doctrine of unconscionability "is to prevent oppression and unfair surprise. J. Calamari & J. Perillo, Contracts (3d Ed.) § 9-40." (Internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes,* supra.[12] There is no bright line test to estab-

RESPECT TO THE EQUIPMENT AND HEREBY DISCLAIMS THE SAME. Lessor agrees that Lessee shall be entitled to the benefit of any manufacturer's Warranties on the Equipment to the extent permitted by applicable law."

[9] Paragraph six provided in relevant part:

"TAXES: INDEMNITY. Lessee agrees to comply with all laws, regulations and orders relating to this Lease and to pay to Lessor when due, all license fees, assessments and sales, use, property, excise and other taxes. . . ."

[10] Paragraph twelve provided in pertinent part:

"INSURANCE. Lessee, at its own cost and expense, shall obtain and maintain for the entire term of the lease, property damage and liability insurance and insurance against loss or damage to the Equipment. . . ."

[11] Paragraph fifteen provided:

"NON-CANCELABLE LEASE, LESSEE'S OBLIGATIONS UNCONDITIONAL. This lease cannot be canceled or terminated except as expressly provided herein. Lessee hereby agrees that a Lessee's obligation to pay all rent and any other amounts owing hereunder shall be absolute and unconditional."

[12] This definition suggests that there are two elements of unconscionability: unfair surprise and oppression. The element of unfair surprise has frequently been termed by commentators and courts as "procedural unconscionability" and is implicated by bargaining improprieties in the contract formation process. The element of oppression has been termed "substantive unconscionability" and is implicated by overly harsh contract terms. See *A & M Produce Co.* v. *FMC Corporation,* 135 Cal. App. 3d 473, 186 Cal. Rptr. 114 (1982); *Master Lease* v. *Manhattan Limousine, Ltd.,* 177 App. Div. 2d 85, 580 N.Y.S.2d 952 (1992); 1 J. White & R. Summers, Uniform Commercial Code (3d Ed. 1981) § 4-3 et seq.; J. Calamari & J. Perillo, Contracts (3d Ed. 1987) §§ 9-37, 9-38; A. Leff, "Unconscionability and The Code—The Emperor's New Clause," 115 U. Pa. L. Rev. 485, 487 (1967).

lish when a contract is unconscionable. Official Comment 1 to § 2-302 of the Uniform Commercial Code (General Statutes § 42a-2-302) suggests, however, that the test is "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." Under that test, "the plaintiff's actions must be weighed against the defendant's business experience, the business practices of the community, and the relatively equal bargaining power of the parties." *Edart Truck Rental Corporation* v. *B. Swirsky & Co.*, 23 Conn. App. 137, 143, 579 A.2d 133 (1990). Unconscionability generally requires a demonstration of "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams* v. *Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965). Each case must be decided individually on its particular facts and circumstances. *Cheshire Mortgage Service, Inc.* v. *Montes,* supra, 89. The party claiming unconscionability bears the burden of proof. *Arkwright-Boston Manufacturers Mutual Ins. Co.* v. *Westinghouse Electric Corporation,* 844 F.2d 1174, 1184 (5th Cir. 1988); *Flow Industries, Inc.* v. *Fields Construction Co.,* 683 F. Sup. 527, 531 (D. Md. 1988); 1 J. White & R. Summers, Uniform Commercial Code (3d Ed. 1988) p. 202. Courts do not generally find contracts unconscionable where the parties are businesspersons. *Edart Truck Rental Corporation* v. *B. Swirsky & Co.,* supra; 1 J. White & R. Summers, supra, p. 225.

In the present case, the trial court made no findings as to either the commercial background surrounding the execution of this lease or the relative bargaining power of the parties. Nevertheless, the record discloses,

and the parties concur, that this was a commercial transaction entered into by two corporate entities. Negotiations took place between the plaintiff and Mann, as president of Waterbury Transmission, regarding the advantages of leasing after Waterbury Transmission had entered into the contract to purchase the pipe bender from Custom. Waterbury Transmission did not rely on any representations by the plaintiff in its decision to purchase the pipe bender.[13]

Although Waterbury Transmission was free to purchase the pipe bender outright from Custom, it opted to enter into the leasing arrangement because that arrangement eliminated the need to make a large initial outlay of cash. The record further discloses that Mann initialed each page of the lease agreement before signing on behalf of Waterbury Transmission and as guarantor. Consequently, in the absence of any contrary findings by the trial court, we infer from our review of the record that the parties were of relatively equal bargaining power and that there were no improprieties in the contract formation process.

We next consider whether the individual clauses or their cumulative effect was so one-sided and oppressive as to be unconscionable. Although such provisions might be unconscionable in an ordinary consumer lease, a different conclusion may follow where, as here, the contract is a commercial finance lease executed by two corporate entities. A finance lease differs considerably from an ordinary lease, which typically involves only a lessor and a lessee, because it involves an additional party, the equipment supplier or manufacturer. Because the finance lessor is strictly a financing entity, the lessee ordinarily must look to that additional party for warranty liability. "In effect, the finance lessee

---

[13] This lack of reliance is specifically recited in the lease: "Lessee acknowledges that it has made the selection of each item of Equipment based upon its own judgment. . . ."

. . . is relying upon the manufacturer . . . to provide the promised goods and stand by its promises and warranties; the [lessee] does not look to the [lessor] for these. The [lessor] is only a finance lessor, and deals largely in paper, rather than goods. In that situation, it makes no sense to treat the [lessor] as a seller to the [lessee] with warranty liability, nor does it make any sense to free the manufacturer . . . from liability for breach of promises and warranties that it would have given in an outright sale to the [lessee]. Usually, the [lessor] expects to be paid, even though the [product] might prove to be defective or totally unsuitable for the [lessor's] particular business. Thus, a finance lease is a very different animal from an ordinary lease." 1A J. White & R. Summers, supra, p. 20.

Evidence of the growing recognition of finance leases may be found in the case law as well as in the promulgation in 1987 of Uniform Commercial Code article 2A, governing leases of goods.[14] Professor Hazard, in his foreword to this section of the code, noted the "exponential expansion of the number and scale of personal property lease transactions" and estimated as of 1987, that those transactions involved billions of dollars annually.

The impetus behind the promulgation of article 2A was the impracticality of applying ordinary sales con-

[14] For analyses of article 2A, see R. Strauss, "Equipment Leases Under U.C.C. Article 2A—Analysis and Practice Suggestions. U.C.C. Revisions: Promises and Pitfalls," 43 Mercer L. Rev. 853 (1992); D. King, "Major Problems With Article 2A: Unfairness, 'Cutting Off' Consumer Defenses, Unfiled Interests and Uneven Adoption," 43 Mercer L. Rev. 869 (1992); W. Lawrence & J. Minan, "Deviations From the Statutory Analogues: The New U.C.C. Article 2A," 40 U. Kan. L. Rev. 531 (1992); P. Breslauer, "Finance Lease, Hell or High Water Clause, and Third Party Beneficiary Theory in Article 2A of the Uniform Commercial Code," 77 Cornell L. Rev. 318 (1992); C. Heckman, "Article 2A of the Uniform Commercial Code: Government of the Lessor, by the Lessor, and for the Lessor," 36 Saint Louis U. L.J. 309 (1992).

tract law to finance leases. Although article 2A has not been adopted in Connecticut,[15] its provisions and commentary are instructive in the present case. See *Texaco, Inc.* v. *Golart,* supra, 461–62 (the standards set forth in the Uniform Commercial Code are a useful guide in examining claims of unconscionability). The essential characteristics of a finance lease were described by Professors White and Summers in their treatise on this article: "The parties can draft a lease agreement that carefully excludes warranty and promissory liability of the finance lessor to the lessee, and that sets out what is known in the trade as a 'hell or high water clause,' namely, a clause that requires the lessee to continue to make rent payments to the finance lessor even though the [equipment] is unsuitable, defective, or destroyed. How the lessee is to be assured that it will enjoy the benefit of the promises and warranties made by the manufacturer may be less obvious, but that too can be accomplished by agreement through a clause in the agreement between the manufacturer and the finance lessor to the effect that the warranties and other promises in that agreement will run to the benefit of the lessee. Thus the finance lessee becomes a third party beneficiary of the contract between the supplier and the finance lessor." 1A J. White & R. Summers, supra.

Professors White and Summers later discuss the rationale behind the validity of such leases: "After all, the parties have actually entered into a financing transaction in which the lessor is really lending money and dealing largely in paper rather than goods. Put another way, the lessor as lender has no interest in how the lessee as debtor chooses to spend the money for goods.

---

[15] By the end of 1991, twenty states had adopted article 2A. W. Lawrence & J. Minan, "Deviations From the Statutory Analogues: The New U.C.C. Article 2A," 40 U. Kan. L. Rev. 531, 532 n.2 (1992).

If the lessee should order an aircraft which is unsuitable or defective, this is not the lessor's problem. The lessor's responsibility is merely to provide the money, not to instruct the lessee like a wayward child concerning a suitable purchase. . . . Absent contrary agreement, even if [for example] our Boeing 747 explodes into small pieces in flight and is completely uninsured, lessee's obligation to pay continues." Id., p. 25.

Against that backdrop, we consider the defendants' arguments seriatim. Their principal claim concerns paragraph nine, which provides at the discretion of the plaintiff, an accumulation of remedies in the event of default including the acceleration of all outstanding payments plus interest at 10 percent from the date of default together with legal fees and costs.[16] The trial court concluded that "[s]uch a clause is punitive and cannot be construed otherwise. . . ."

Accelerated payment clauses are unexceptional in contracts; 2 J. White & R. Summers, Uniform Commercial Code (3d Ed. 1988) p. 565; and are in fact authorized by statute. See General Statutes § 42a-1-208;[17] see also Uniform Commercial Code § 2A-109.[18] Given the context of a commercial finance lease involving parties of relatively equal bargaining power, we conclude that the provision here is not unconscionable. Nor do

[16] The parties agree that this clause is a liquidated damages provision.

[17] General Statutes § 42a-1-208 provides: "A term providing that one party of his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised."

[18] Uniform Commercial Code § 2A-109 provides: "(1) A term providing that one party or his [or her] successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he [or she] deems himself [or herself] insecure' or in words of similar import

the additional remedies of legal fees and costs[19] and interest at the rate of 10 percent[20] make this clause unconscionable.[21] Depending on the circumstances of the case, contractual provisions that provide for legal fees and interest are valid and enforceable.[22] See J. Calamari & J. Perillo, Contracts (3d Ed. 1987) § 14-35 (legal fees recoverable as provided in a lease); see also *Ruscito* v. *F-Dyne Electronics Co.*, 177 Conn. 149, 163, 411 A.2d 1371 (1979) ("[i]t is fundamental that interest is allowed on the ground of some contract express or implied to pay it, or as damage for the breach of some contract"); *Litton Industries Credit Corporation* v. *Catanuto*, 175 Conn. 69, 76, 394 A.2d 191 (1978) (leasing agreement may provide for the payment of attorneys' fees); *Guaranty Bank & Trust Co.* v. *Dowling*, 4 Conn. App. 376, 494 A.2d 1216, cert. denied, 197 Conn. 808, 499 A.2d 58 (1985) (legal fees and interest recoverable as provided in a promissory note); *Equitable Lumber Corporation* v. *IPA Land Development Corporation*, 38 N.Y.2d 516, 344 N.E.2d 391, 381 N.Y.S.2d 459 (1976) (legal fees recoverable as provided in a lease). Likewise, in the present case these provisions are enforceable.

must be construed to mean that he [or she] has power to do so only if he [or she] in good faith believes that the prospect of payment or performance is impaired.

"(2) With respect to a consumer lease, the burden of establishing good faith under subsection (1) is on the party who exercised the power; otherwise the burden of establishing lack of good faith is on the party against whom the power has been exercised."

[19] Cf. General Statutes § 42-150aa limiting attorney's fees in consumer contracts and leases.

[20] The rate of 10 percent is less than the rate prohibited for loans by General Statutes § 37-4 and is equal to the rate recoverable in negligence actions; General Statutes § 37-3b; and as damages. General Statutes § 37-3a.

[21] The validity of the provisions regarding legal fees, costs, and interest comprises the plaintiff's third claim. Because the trial court considered these provisions in the context of the overall unconscionability of the lease, we address them at this juncture rather than as a separate claim.

[22] Uniform Commercial Code § 2A-108 provides for the award of reasonable attorney's fees in claims of unconscionability apart from the terms of the contract.

The defendants also contend that paragraph four, which disclaims all express or implied warranties and assigns any manufacturer's warranties to Waterbury Transmission, is unconscionable. Courts have recognized that such clauses are generally enforceable in leasing agreements. See, e.g., *U.S. Roofing, Inc.* v. *Credit Alliance Corporation,* 228 Cal. App. 3d 1431, 279 Cal. Rptr. 533 (1991) (financing lessor may validly disclaim all warranties if the lessee has an adequate remedy against the manufacturer or supplier for a defect in the equipment); *Trans Leasing International* v. *Schomer,* 194 Ill. App. 3d 70, 550 N.E.2d 1085 (1990); *All-States Leasing* v. *Top Hat Lounge, Inc.,* 198 Mont. 1, 649 P.2d 1250 (1982); *Master Lease* v. *Manhattan Limousine, Ltd.,* 177 App. Div. 2d 85, 580 N.Y.S.2d 952 (1992); *Irving Leasing Corporation* v. *M & H Tire Co.,* 16 Ohio. App. 3d 191, 475 N.E.2d 127 (1984) (a lessor's disclaimer is generally valid as to equipment of which it had no active dealings in the manufacture or selection if the lessee is not left without a remedy); compare *Pactel Finance* v. *D.C. Marine Service Corporation,* 136 Misc. 2d 194, 518 N.Y.S.2d 317 (1987) (disclaimer unconscionable because contract was more in the nature of a sale than a lease).[23]

The defendants argue, nevertheless, that this provision is unconscionable because (1) the disclaimer violated General Statutes § 42a-2-316[24] in that it was not conspicuous, and (2) it left the defendants with no recourse when the pipe bender failed to perform as expected.

---

[23] See also J. Schmitt, "Unconscionability and Disclaimer of Warranties in Lease Agreements Under the Uniform Commercial Code," A.B.A. Committee on Commercial & Banking Litigation, Fall 1992, p. 2.

[24] General Statutes § 42a-2-316 provides in relevant part: "(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."

First, we consider whether the disclaimer was conspicuous. General Statutes § 42a-1-201 (10) provides: " 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. . . . Whether a term or clause is 'conspicuous' or not is for decision by the court."

The disclaimer here states: "LESSOR MAKES NO EXPRESS OR IMPLIED WARRANTIES INCLUDING THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE WITH RESPECT TO THE EQUIPMENT AND HEREBY DISCLAIMS THE SAME." This is the *sole* portion of text on the entire page of the lease in capital letters. In addition, the spacing of the characters differs in that it is more generous than any other portion of text on the page. Moreover, the heading of the paragraph, entitled "WARRANTIES," is also in capital letters as suggested by the statute. Accordingly, we conclude as a matter of law that the disclaimer complies with the statutory definition of "conspicuous."[25]

The defendants also reason that the clause is unconscionable because it left them with no recourse when the pipe bender failed to perform as expected. While the lease disclaimed all warranties, it specifically assigned any manufacturer's warranties to the defendants. Although this type of clause in finance leases has been found to be enforceable by the courts, the defendants claim that in the present case the clause is objec-

---

[25] The defendants also argue that the disclaimer should be considered unconscionable in view of their relative lack of experience and sophistication. As we have previously stated, there was no such finding by the trial court and we, therefore, decline to review this aspect of the defendants' argument.

tionable because there actually were no manufacturer's warranties, thus leaving them with no remedy. Some courts have recognized that in such a situation, a lease may be unconscionable. See, e.g., *U.S. Roofing, Inc., v. Credit Alliance Corporation,* supra; *Irving Leasing Corporation* v. *M & H Tire Co.,* supra. In the present case, however, the trial court found that "[t]he defendants, notwithstanding the provisions of paragraph 9, *could have enforced their rights under the sales agreement with Custom.*" (Emphasis added.) Accordingly, we reject the defendants' argument on this point as well.

The defendants also attack the validity of paragraph fifteen, which states that the lease cannot be canceled or terminated by Waterbury Transmission and that its obligation to pay is absolute and unconditional. This provision is frequently part of a finance lease because upon delivery and acceptance of the subject equipment, the lessor's promised obligation, which is to purchase the equipment, has been fulfilled.[26] The lessor's money has been spent and it is required to do nothing further. In that respect, the lessor's position is similar to that of a bank holding a note for the price of the equipment. The lessee, however, will not have fulfilled its promised obligations until all rental payments have been made.[27] The purpose of the clause, therefore, is to

---

[26] There is no claim in the briefs that the defendants revoked their acceptance of the pipe bender.

[27] Article 2A of the Uniform Commercial Code addresses this problem in the following manner:

"§ 2A-407. IRREVOCABLE PROMISES: FINANCE LEASES

"(1) In the case of a finance lease that is not a consumer lease the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods.

"(2) A promise that has become irrevocable and independent under subsection (1):

"(a) is effective and enforceable between the parties, and by or against third parties including assignees of the parties, and

"(b) is not subject to cancellation, termination, modification, repudiation,

ensure completion of the lessee's performance. This is not unconscionable in the context of a finance lease where, as here, the facts and circumstances do not indicate any inequality of bargaining power or element of unfair surprise.

Similarly, paragraph six, which requires Waterbury Transmission to pay all taxes on the equipment and paragraph twelve, which requires it to provide insurance on the equipment, are neither individually nor, within the entire framework of the lease, cumulatively unconscionable.

We conclude, under the facts and circumstances of this case, that the individual provisions of this finance lease were not unconscionable and that the cumulative effect of the provisions was not unconscionable. Because of our resolution of this claim, we do not reach the plaintiff's remaining claim that the trial court improperly failed to limit the unconscionable portion of the remedies provision.

## II

### CROSS APPEAL OF THE DEFENDANT MARVIN MANN

The defendant Mann claims that the trial court improperly found (1) that he had abandoned his counterclaim and (2) that there was insufficient evidence to support the counterclaim. We decline to address Mann's second argument because our resolution of his first is dispositive of the cross appeal.

The trial court had ordered the parties to file briefs setting forth proposed findings and claims of law. Neither Mann's brief nor his supplemental brief mentioned

---

excuse, or substitution without the consent of the party to whom the promise runs.

"(3) This section does not affect the validity under any other law of a covenant in any lease contract making the lessee's promises irrevocable and independent upon the lessee's acceptance of the goods."

either claim raised by the counterclaim. As a result, the trial court ruled that the counterclaim "is deemed to have been abandoned."[28]

Practice Book § 285A provides: "The parties . . . shall, if the court so orders, file, at such time as the court shall determine, written trial briefs discussing the issues in the case and the factual or legal basis upon which they ought to be resolved. If a party intends to raise any claim of law which may be the subject of an appeal, he must either state the same distinctly to the court before his argument is closed or state it in a written trial brief. *If this is not done, it will not be the duty of either the trial court or the appellate court to decide the claim.*" (Emphasis added.)

Accordingly, because Mann did not raise these issues in his trial brief or supplemental trial brief, we do not decide them now.

## III

### SPECIAL DEFENSES

Because we conclude that the trial court improperly decided that the lease was unconscionable, we next consider the request of the defendant Waterbury Transmission that we remand the case for a new trial on its other special defenses. In addition to the special defense of unconscionability, Waterbury Transmission also alleged that (1) because the pipe bending machine was defective, there was a total failure of consideration and (2) the plaintiff failed to mitigate its damages.

The trial court did not include its conclusions as to these special defenses in its memorandum of decision. See Practice Book § 4059. Nevertheless, a new trial is not necessary. First, the special defense alleging a failure of consideration was not raised in either of Water-

---

[28] The ruling was part of the court's memorandum of decision on the defendant's motion for articulation.

bury Transmission's trial briefs and, consequently, as was the case with the defendant Mann's counterclaim; see part II, supra; the trial court was under no duty to decide this issue. Practice Book § 285A. We will not remand the matter to the trial court for consideration of a claim that Waterbury Transmission did not distinctly raise in its trial brief.

Second, Waterbury Transmission's special defense alleging that the plaintiff failed to mitigate damages, although raised in the trial brief, similarly does not require a new trial. The trial brief stated that "if the court finds an enforceable lease, it must reduce the plaintiff's damages by a commercially reasonable amount for its failure to take any steps to mitigate its damages." The court did not address the claim because it found the lease to be unenforceable.

Our review of the transcript reveals that Waterbury Transmission had ample opportunity to present evidence on this defense at trial and availed itself of that opportunity. Consequently, because Waterbury Transmission has already had the opportunity to fully litigate this issue and because this issue affects only the amount of the judgment, a new trial is inappropriate and unnecessary. Instead, we remand the case to the trial court with direction to determine and articulate the effect, if any, of this special defense on the amount of the judgment.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment for the plaintiff and to determine (1) the amount of interest and attorney's fees, if any, to be awarded to the plaintiff and (2) the effect on the amount of the judgment of Waterbury Transmission's special defense alleging that the plaintiff failed to mitigate damages. The judgment on the counterclaim is affirmed.

In this opinion the other judges concurred.