[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
The above-captioned case was tried to the court without a jury in a trial that was concluded on November 3, 2000. The court heard post trial argument on December 18, 2000. In their Third Amended Revised Complaint the plaintiffs, Vincent Celentano, Mary Celentano, Marvin R. Leventhal, Richard A. LoRicco, and Lawrence Levy seek payment of ground rents and taxes that they claim that defendant Oaks Condominium Association and the defendant members of its board of directors collected from unit owners who are assignees under a ground lease. (First Count.) The plaintiffs allege that the defendants have been negligent in the manner in which they undertook duties to collect amounts due from owners of condominium units. (Second Count.) The plaintiffs further allege that the defendants should be ordered to furnish them with an accounting of ground rents collected and disbursed (Third Count); that the defendants converted to their own use funds that were the property of the plaintiffs (Fourth Count) and that the defendants violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq.
The individual defendants named in the complaint are members of the board of directors of the condominium association: Carol Beers, Edward Wheeler, Carolyn Newton, Linda Masvidal Libby, Maureen Bell, James Sweetman, Charles Lohrenz, Susan Smolen, Pam Moffitt, Tyrone Griffin, Roberta Brooks and Wally Roberts.
The defendants assert in special defenses that the two leases the plaintiffs seek to enforce are illegal and unconscionable and are therefore void and unenforceable; that the plaintiffs' claims are barred by the doctrine of equitable estoppel and that the plaintiffs waived arbitration rights. In their counterclaims, the defendants claim that title should be quieted by declaring the Association the owner of the property to which the leases apply (First Count); that the plaintiffs have been unjustly enriched by payments of ground rents after December 3, 1987 CT Page 656 (Count Two); that the defendants are entitled to specific performance of an option to purchase the property that is the subject of the ground leases (Count Three); that a declaratory judgment should enter declaring the ground leases to be unconscionable pursuant to Conn. Gen. Stat. § 47-210 and therefore void and unenforceable (Count Four); that the plaintiffs breached the covenant of good faith and fair dealing in connection with the ground leases (Count Five); that the plaintiffs violated CUTPA (Count Six); and that the plaintiffs' actions constitute conversion (Count Seven). In special defenses to the defendants' counterclaims, the plaintiffs allege that the defendants' counterclaims are barred by "the applicable statutes of limitation," laches, promissory estoppel, waiver, the provisions of Conn. Gen. Stat. § 47-33a, failure to mitigate damages, and unclean hands. The plaintiffs further assert as special defenses that the defendants are not entitled to invoke Conn. Gen. Stat. § 47-210 and that this statute, which sets forth criteria for a court to assess in determining whether a lease involving a condominium project is unconscionable, is unconstitutional as a private emolument, as a violation of due process of law, as a violation of the bar to impairment of private contracts, and as violative of Conn. Gen. Stat. § 55-3.
The plaintiffs had claimed as a further special defense to the defendants' action for a declaratory judgment that all necessary parties had not been named. On September 6, 2000, the court issued an order of notice to the lienholders that the plaintiffs identified as the missing necessary parties. The defendants complied, and this defense is therefore without merit.
The ground leases at issue provide for arbitration in the event that the parties are unable to agree on the purchase price upon exercise of the option to purchase the land that is the subject of the ground leases. The parties stipulated that in lieu of seeking specific performance of the duty to arbitrate, they all waived arbitration and seek adjudication by the court of the arbitrable issues.
I. Summary of Claims 
Because the pleadings include numerous counts and invoke many legal theories, it is useful to summarize the position of each side. The plaintiffs take the position that they leased the land on which the apartment buildings at 79 and 80 Claudia Drive are located to Melrose Apartments, Inc. ("Melrose"); that Melrose declared a condominium, sold apartment units, and assigned percentages of the ground leases to the purchasers of units; and that pursuant to the leases, the parties designated the association's board of directors or designee to collect from each unit owner his or her percentage of the payment due under the CT Page 657 ground lease and to pay it to the plaintiffs. The leases grant the association an option to purchase the land. The plaintiffs claim that the association could have exercised this option but failed to bring an action to enforce its right within the statutory time limit set by Conn. Gen. Stat. § 47-33a. The plaintiffs assert that the association unjustifiably ceased paying the ground rents it collected to the plaintiffs but instead placed them in escrow and at times used sums from the escrow account to pay for maintenance of the common areas. Additionally, the plaintiffs claim that the association and its directors had a duty to use greater efforts to collect arrearages in rents from delinquent defendants. They seek an accounting of rents collected by the association, among other remedies.
The defendants take the position that the association validly exercised the purchase option, and that the purchase never actually occurred because the plaintiffs breached the lease contract by thwarting the association's attempts to have the purchase price decided by arbitration. The defendants claim that after the association's exercise of the option to purchase, its members no longer owed any ground rents to the plaintiffs. Because the validity of exercise of the option was disputed, the association's managing agent continued to collect ground rents and put them into escrow.
The defendants claim that condominiums built on leased land are not authorized by the Connecticut Condominium Act and that the leases are unconscionable when analyzed under common law principles and by the process set forth in Conn. Gen. Stat. § 47-210, a statute concerning leases of common elements that was enacted after the commencement of this action. The defendants allege that the rent charges and other obligations imposed in the leases failed to comply with the requirements of this statute and that the leases are "therefore unconscionable and void.
The court will discuss other features and details of the parties' positions below.
II Findings of Fact 
Before November 30, 1982, the plaintiffs other than Marie Celantano were the record owners of the land and apartment buildings at 79 and 80 Claudia Drive in West Haven.[1] On August 1, 1981, the plaintiffs and Melrose executed an Option to Purchase by which the plaintiffs agreed to sell the buildings at 79/80 Claudia Drive to Melrose subject to a ninety-nine year leasehold on the land on which they were located. On the basis of that option agreement, Melrose bought the buildings at 79 and 80 Claudia Drive on November 30, 1982, borrowing the purchase price from the plaintiffs, who took back a mortgage in the amount of $1,606, 000. On the CT Page 658 same date, the plaintiffs and Melrose executed two ninety-nine year leases for the land on which the buildings at 79 Claudia Drive and 80 Claudia Drive are located. Each lease provided for rent in the amount of $16,200 per year for the first seven years and increases each year thereafter, rising to $60,912 in the fifteenth year of the lease. There are fifty-four units in the apartment building at 79 Claudia Drive and fifty-four units in the apartment building at 80 Claudia Drive.
The two buildings include six efficiency apartments, 70 one-bedroom and 23 two-bedroom apartments. The complex includes only the rectangular, flat-roofed apartment buildings near Route 95 in West Haven. It does not include a club house or any amenities other than parking spaces for unit owners and a laundry room in each building. The two apartment buildings occupy 3.9 acres of land, which is the subject of the ground leases.
Also on November 30, 1982, Melrose declared a condominium consisting of its leasehold interest in the land and its ownership of the buildings. Melrose issued a Declaration of Condominium dated November 30, 1982, that defines the property being declared to be a condominium as "The leasehold interest of the Declarant in and to that piece or parcel of land situated at 79 Claudia Drive, West Haven, Connecticut and more particularly described in Schedule A attached hereto the buildings, all improvements and structures thereon, an rights and appurtenances belonging thereto." (The document does not include a comma between the words "hereto" and "the buildings.") The declaration defines a "unit owner" as "the person or persons owning a Unit in fee simple absolute, or leasing a unit as hereinafter provided, and an undivided interest in the fee simple or leased estate of the common areas and facilities in the percentage specified in this Declaration." The project was later expanded to include 80 Claudia Drive,
Melrose sold units in the building to purchasers by way of a document titled "Deed of Condominium Unit and Assignment of Leasehold Interest." The property conveyed in the deed to each unit owner was
[t]he following described Leasehold Estate and Real Property with appurtenances thereto located in the Town of West Haven . . . known as Unit [number] of The Oaks condominium, An Expandable Condominium, together with an undivided [___%] percent interest in the common elements and appurtenant thereto, and all of the right, title and interest of the Grantor in and to a [___%] percent and fractional interest in and to a certain leasehold estate created pursuant to the terms and conditions of a certain Ground Lease by and between Richard A. LoRicco, et als and Melrose CT Page 659 Apartment, Inc. dated the 30th day of November, 1982 . . .[2]
The deeds by which unit members acquired their units stated that "said premises are subject to the terms and conditions of a ground lease dated November 30, 1982 . . ." The plaintiffs do not claim that each purchaser also signed a lease with regard to the land but that they received fractional interests in it by assignment. The leases were filed in the land records of the Town of West Haven in 1982.
The association is not a party or an assignee of the lessee under the ground leases. By the terms of the lease, no unit owner has an obligation to pay any portion of the ground lease rent other than the percentage ascribed to his or her unit, nor does the association have any obligation to pay the plaintiffs any ground lease rents that unit owners fail to pay.
The ground leases provide that unit owners
 shall have and are hereby collectively granted an option to purchase the Land which option shall be exercisable within a twelve (12) months period which shall commence upon the ELEVENTH anniversary year of this lease for a price which is the lower of(1) the current appraised market value of the Land or (2) 13% of the then current appraised market value of the Land and improvements. Such option shall be exercisable by vote of the Condominium Unit Owners in accordance with the said Declaration and By-laws and Lessor, their successors and assigns, agree in that event to offer, give and grant a PURCHASE MONEY MORTGAGE for the agreed purchase price, at the then prevailing F.N.M.A. mortgage yields applicable to 90% multiple family or land loans, self liquidating within a twenty-five year term.
 If for any reason, F.N.M.A. is non-existent at such time, then the prevailing mortgage rate shall be that as promulgated by the First Bank, One Church Street, New Haven, Connecticut.
For the purposes of the computation of said land, (sic) the remaining term of this lease shall be taken into account as though such option rights did not exist. CT Page 660
 In the event the parties are unable to agree upon the then fair market value of the Land, then the question shall be submitted to arbitration under the rules of the American Arbitration Association, and any decision rendered therein shall be conclusive and binding upon each party. In the event that the option to purchase is exercised, the responsibilities and obligations of each party to the other as provided in these lease shall terminate and the Lessors shall execute and deliver to the Condominium Unit Owners, or their designee or representative (which may be the Association of Unit Owners as defined in the Declaration and By-Laws at the option of the Condominium Owners) a warranty deed to the Land showing the same to be free and clear of all encumbrances excepting those which may be acceptable to the Condominium Unit Owners or their designee or such representative.
Though Melrose was the original lessee under both ground leases, it actually operated only as a conduit or "straw man." It never paid ground rents itself and it was tacitly understood by the lessors that no rents would be due until the units were sold, such that only unit owners, not Melrose, would ever pay the rents due under the leases.
By a letter dated July 24, 1991 (Exh. 445B), Stephen Small, the attorney for the association, advised Richard LoRicco, who acted as the representative of the lessors, that the association "is considering the possibility of exercising its option to purchase the land presently leased to it by Melrose Apartments, Inc, under two Leases dated November 30, 1982." Attorney Small inquired about the purchase price that the lessors would propose. Mr. LoRicco, who is an attorney, did not respond until October 1, 1991. In a letter of that date, he stated that the lessors "would consider a purchase price in the total amount of $1,641,600.00 with a thirty (30) year — 90% purchase mortgage" with escalating interest rates starting at seven percent in the first year. By a letter dated February 10, 1992, Attorney Small inquired how Attorney LoRicco and the other lessors had arrived at the proposed purchase price, and pointed out that the mortgage terms outlined were not in accordance with the provisions of the option clause.
In January 1993, Attorney Small repeated his request for an explanation of the lessors' claim of value and noted that "[t]he option is extremely unclear . . ." and that "[a]lso it is unclear as to when the option to purchase may be exercised." He asked the lessors to confirm in writing how they arrived at the option price and "what you believe to be the period CT Page 661 within which to exercise said option." (Exh. 490.) Attorney LoRicco responded that he "would not presume to advise you or the Association as to what is `the period within which to exercise said options.'" and noted that in the past the parties had disagreed on the dates on which lease increases went into effect. (Exh. 491.) Those increases took effect in designated years of the lease, and the parties had differed on whether the year began in January, the term of the lease, or November, the date the lease was signed.
During 1992 and early 1993, the lessors and the association were experiencing conflicts concerning the amount of ground lease payments being collected and remitted by the managing agent. The correspondence between counsel for the parties indicates that in 1989 the association and the lessors had different interpretations concerning the dates on which rent increases were to occur for each of the buildings. A letter from Attorney William Tiernan, who was counsel for the association in 1989, indicates that there was a dispute concerning the amount of the payments, that discussions had been held in the courthouse, and that the parties were not in agreement concerning the rents due for various time periods. (Ex. 10.)
In March of 1993, Willis Graham, who was acting as condominium manager on behalf of the association, took the position that the association had been overpaying ground rents, apparently because it had been paying the entire rental amount specified in the lease without deducting amounts owed by some unit owners who had not in fact paid their portion of the ground rents to the association. Mr. Graham reported to Attorney LoRicco that the association was due a credit in the amount of $19,531 for such overpayments.
After some additional correspondence in early 1993, Attorney Small sent the lessors a letter on April 2, 1993, stating that his client "wishes to exercise the options to purchase contained in said leases" and identifying the "option price" as "$416,000 based upon 13% of the current market value of the land and improvements, as determined by my client's appraiser." (Exh. 457.)
The lessors responded, in a letter from Attorney LoRicco dated April 7, 1993 that "I have noted your client's intention to exercise its option to purchase our land leases." Attorney LoRicco stated that the price offered was too low and inquired about the mortgage terms outlined in Attorney Small's April 2, 1992 letter. (Exh. 458.)
The court infers that after the April 7, 1993 letter from Attorney LoRicco, counsel for the association began to suspect that the lessors might take the position that the exercise of the purchase option was not CT Page 662 timely. Attorney Maureen Williams, an associate of Attorney Small, wrote to counsel for the lessors, Paul Sabetta, on December 16, 1993, stating that "One possible construction of the land lease would have the Eleventh Anniversary Year of the lease commencing November 30, 1993. In view of the same, this letter confirm (sic) that my clients wish to exercise the option to purchase upon the same terms and conditions as evidenced earlier — price of $416,000, interest at 7.75%. Unless I hear from you by the close of business today, I shall assume that this offer is unacceptable."
Attorney Small proposed proceeding with arbitration regarding both the purchase price and the issue of the claimed rent arrearages; and Attorney LoRicco responded that "no option is available and/or will be recognized when the account is delinquent." (Exh. 35.)
The association filed a demand for arbitration with the American Arbitration Association on June 16, 1993, seeking to arbitrate the "valuation of an option to purchase a land lease for premises commonly known as 78 and 80 Claudia Drive, West Haven, Connecticut and issues ancillary thereto." (Ex. 39.)
The lessors filed an action to enjoin the arbitration. In October 1994, the court (Booth, J.) ruled the arbitration was not available as to any issues other than the value of the land, apparently on the basis that this was the only issue that the lessors had agreed in writing to arbitrate. Connecticut General Statutes § 52-408 provides that only written agreements to arbitrate are enforceable. Judge Booth did not decide whether the option had been validly exercised or whether the alleged breach of the duty to collect and remit ground rents barred the unit owners from exercising the purchase options.
The lessors steadfastly refused to state an opinion concerning the dates between which they regarded the option as exercisable until December 1993, when they took the position that the association had "improperly and/or untimely exercise the subject option to purchase." (Exh. 467.) Despite this communication, the association's lawyer sent Attorney Sabetta a letter dated February 15, 1994, stating his client's desire to exercise the option; and in a letter dated May 4, 1994, the association, by its counsel, Maureen Williams, conveyed to the plaintiffs an offer to purchase for $500,000, with a thirty-year mortgage to be provided by the plaintiffs at eight percent interest. If the plaintiffs responded in writing, the response is not in evidence.
Instead of revising their demand for arbitration to include only the determination of the purchase price, the plaintiffs withdrew the demand for arbitration sometime in 1994 or 1995, on a date that was not CT Page 663 identified in the evidence presented. The court infers from the association's very tentative and indecisive conduct that the unit owners were not prepared to pay any price that an arbitrator decided was the fair market value of the land, but were hoping to reach an agreement for a definite price at a level that the plaintiffs did not accept.
Additional findings of fact are set forth in connection with the court's discussion of the various claims of the parties. Because the issue of exercise of the purchase option affects the determination of the other rights and remedies at issue, the court will consider first the claims that relate to that issue.
III. Are the Unit Owners Entitled to Specific Performance of the PurchaseOption?
In the third count of their counterclaim, the defendants seek specific performance of the purchase option. The plaintiffs have raised the defense that this claim was brought beyond the time authorized by Conn. Gen. Stat. § 47-33a, which limits the time for enforcement of such options, and is therefore not enforceable. The defendants claim that the period should be extended because of conduct by the plaintiffs that the defendants allege requires application of the doctrine of equitable tolling of the limitation period.
As has been detailed above, the ground leases gave the unit owners collectively an option to purchase the land on which the condominium units are situated. The time for exercise of that option is identified as "within a twelve (12) month period which shall commence upon the ELEVENTH anniversary year of this lease. . ."
The defendants allege in Count Three of their amended counterclaim that Attorney Small exercised the option on behalf of the unit owners on April 2, 1993, and again on December 16, 1993, and that his colleague, Attorney Williams, stated an offer to purchase (though with different mortgage terms than the lease indicated) in May 1994. (Paragraphs 33 and 36 and 37 of the Amended Answer, Special Defense and Counterclaim 4/25/00.)
At trial, evidence was presented that the association's counsel proposed purchase again in February 1994. This offer is not alleged in the complaint to constitute an exercise of the option.
The court must determine whether any of the three communications from the association (April 1993, December 1993, or May 1994) was made within the time period during which the option could be exercised, whether the exercise complied with the terms of the option in substance, and whether the association brought an action to enforce the contract created by the CT Page 664 exercise of the option within the time period allowed by statute.
Though the leases are dated November 30, 1982, the leases state that "the term of the leasehold created hereby shall be ninety-nine (99) years commencing on the last day of January, 1982 and ending on the 31st day of December 2081. . ." By their terms, therefore, each lease identifies January 31, 1982, as the commencement of the lease, and there is no basis therefore for construing a term that starts on a different date.
The Supreme Court has repeatedly held that in interpreting contract terms, the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.Sturman v. Stocha, 191 Conn. 1, 10 (1983); Marcus v. Marcus, 175 Conn. 138,141-42 (1978). The language of a contract is to be construed against the party who drew it and whose language it is. Sturman v. Stocha, supra,191 Conn. 9; Ravitch v. Stollman Poultry Farms, Inc., 165 Conn. 135,145-46 (1973).
The association was not even in existence at the time the lease was drafted, and the evidence indicates that the lessors dictated its content. Accordingly, the ambiguous language must be construed against the lessors, and the court finds that January 31, 1993 to January 30, 1994, the period identified by the defendants, is the period during which the purchase option was exercisable.
In their pleadings and briefs, the defendants have indicated that they understood the option period as running from January 1993 to January 1994. At paragraph 50(d) of their counterclaim, the defendants allege that "[t]he eleventh anniversary year of the lease ran from January 1, 1993 to January, 1994." In June 1995, when they filed a counterclaim seeking a declaratory judgment that the association had validly exercised its option to purchase the land, the defendants alleged that the option was exercised on April 2, 1993, and on December 16, 1993, and they made no claim that the May 1994 letter constituted a valid exercise of the option.
The defendants concede in their trial brief that "[t]o be effective, an acceptance of an offer under an option contract must be unequivocal, unconditional and in accordance with the precise terms of the option." (Brief, p. 7). Indeed, a party exercising an option must do so "in exact accord with the terms of the option." Smith v. Hevro Realty Corp.,199 Conn. 330, 339 (1986); 1A Corbin, Contracts (1963) § 264, p. 523. In the May 4, 1994 letter, the association offered to buy the land upon terms that included not the twenty-five year mortgage stated in the CT Page 665 terms of the option offer, but rather a thirty-year mortgage. This variance rendered the May 4, 1994 acceptance ineffective as an exercise of the option, even if May 4, 1994, were somehow to be construed to be within the period for exercising the option.
The lessors suggest that the April 2, 1993 letter from Attorney Small did not constitute an exercise of the option because Attorney Small did not use the word "hereby," but stated somewhat informally that his client "wishes to exercise the option to purchase contained in said leases." Though the lessors purport to read this notification as stating only future intent, not present intent, that reading is strained. On a prior occasion, Attorney Small had made what was clearly a preliminary overture in which Attorney Small stated that his client "is considering the possibility of exercising its option to purchase the land." (Exh. 445B.) The April 2, 1993 letter, by contrast, expressed the wish to exercise, not to explore the possibility of exercising, and Attorney Small removed any ambiguity by stating what his client believed the purchase price should be ("The option price will be $416,000.00 based upon 13% of the current market value of the land . . .") and requested the mortgage documents that the option process required the lessor to provide.
Attorney LoRicco responded by a letter dated April 7, 1993, stating: "I have noted your client's intention to exercise its option to purchase our land lease." At trial, this witness took the position that the unit owners had not stated a present intent to exercise the option; and he sought to characterize the above statement as stating only an understanding that the unit owners planned to exercise the option at a future time. This construction is negated by the second paragraph of his letter, in which Attorney LoRicco comments in a manner that indicated a plain understanding that the unit owners were in fact proposing to purchase the land for $416,000:
 It appears that your client's option price is so unreasonably low, the partners can only conclude it is not made in earnest and good faith. However, before any decision is made, they would like to review your appraisal.
In the same letter, Attorney LoRicco also requested an explanation of the source of the mortgage note identified by the unit owners.
The lessors have not taken the position that exercise of the option was not complete until the resolution of the price by arbitration; rather, at all times during the trial, they have conceded that an offer made within the time period specified by the lease was sufficient to constitute exercise of the option. The lessors object that the association did not CT Page 666 present evidence of a vote by unit owners before the option was exercised. Whatever the basis of Attorney Smalls authority was at the time he communicated the offer in April 1993 and December 1993, the unit members plainly ratified his offers by a vote at the annual meeting on May 13, 1993. (Exh. 441.) The court finds that the association exercised the purchase option in a timely fashion on April 2, and December 16, 1993.
The unit owners filed a counterclaim to the lessors' action on June 27, 1995. In that counterclaim they sought a declaratory judgment that they had validly exercised the option on April 2, 1993, December 10, 1993, and "December 1994." They did not seek specific performance of the option. On April 25, 2000, they amended their counterclaim to seek, in Count Three, specific performance of the option, claiming that it had been validly exercised on April 7, 1993, December 16, 1993, and May 4, 1994. The lessors denied the allegations of timely exercise of the option and filed special defenses to the claim for specific performance, alleging that the claim was time-barred .pursuant to Conn. Gen. Stat. § 47-33a(a) and the doctrine of laches. The association filed no action for specific performance at any time before it filed its counterclaim in the lessors' action in June 1995.
Conn. Gen. Stat. § 47-33a(a) provides in pertinent part: "[n]o interest in real property existing under . . . an option to purchase real property shall survive longer than one year after the date provided in the agreement for the performance of it, or, if the date is not so provided, longer than eighteen months after the date on which the agreement was executed, unless the interval is extended as provided herein or unless action is commenced within the period to enforce the agreement and notice of lis pendens is filed as directed by section 52-325."
In Texaco Refining Marketing, Inc. v. Samowitz, 213 Conn. 676, 683
(1990), the Supreme Court construed § 47-33a(a), in the context of a purchase option in a long-term lease, to require a party to file an action for specific performance within eighteen months of that party's exercise of the option. The Court reasoned that an "executory agreement for the sale of real property" did not come into existence until the exercise of the option, and that since the contract did not state when performance of the duty to sell was to occur, the party holding the option had eighteen months from the exercise of the option to enforce the duty to convey the property.
Even if an action for a declaratory judgment were viewed as satisfying the statutory requirement to commence an action for specific performance, the counterclaim dated June 27, 1995, was brought more than eighteen months from both the April 2, 1993, and the December 16, 1993 CT Page 667 exercises of the option.
The unit owners claim that the limitation period should be tolled because the lessors refused to advise them concerning the dates when the option could be exercised and took the position that the option could not be exercised while there was a claimed arrearage in the payment of ground rents. The assertion of such positions did not, however, pose any impediment to the prompt filing of an action for specific performance.
The defendants cite Bertozzi v. McCarthy, 164 Conn. 463, 470 (1973), in which the Connecticut Supreme Court ruled that a party's delay is excused if it was caused in part by the acts of the other party, and Morris v.Costa, 174 Conn. 592, 601 (1978), and Sullivan v. Bergenty, 214 Conn. 641,648 (1990), in which the Court ruled that actions by one party on which the other relies in changing its position or delaying taking action toll deadlines. While the lessors were evasive about whether they regarded the exercises of the purchase option to be timely, none of their proven conduct was related to inducing the defendants to delay an enforcement action. The plaintiffs' refusal of the defendants' offers and statements that the option could not be exercised because the rents were in arrears were of a character to put the defendants on notice that an enforcement action was indeed necessary, and can in no way be characterized as creating an impression that the matter could be resolved without resort to such an action. The lessors' conduct was not of a nature to lull the association into thinking that no enforcement action was necessary. On the contrary, the steadfastly oppositional conduct of the lessors should have conveyed the necessity of bringing an enforcement action.
The defendants suggest that the existence of the arbitration clause in the contract served to confuse the issue. The only issue related to the purchase option that the lease required to be submitted to arbitration was the purchase price, not the duty to convey the land. The arbitration clause provided that:
 In the event the parties are unable to agree upon the then fair market value of the land, then the question shall be submitted to arbitration under the rules of the American Arbitration Association . . .
The defendants have not claimed that the option was not fully exercised and that the limitation period did not begin to run until the price was set by arbitration. They cannot legitimately make that claim, since they did not pursue an arbitration to determine the purchase price but withdrew the demand for arbitration and brought no action for specific performance within eighteen months of December 16, 1993. CT Page 668
The lessors had sought to enjoin the arbitration in July 1993 because the demand for arbitration was not restricted to the issue of the purchase price but included "ancillary issues," specifically, the parties' disputes over ground rents. The lessors' opposition to arbitration of issues beyond the purchase price cannot be characterized as an impediment to the filing by the association of an action for specific performance. The association was free to include in such an action a demand for specific performance of the agreement to submit the price to arbitration. It was also free to amend its demand for arbitration to restrict it to the issue of the price to be paid for the land. Instead, the association withdrew the arbitration proceeding. The defendants have adduced no evidence to establish that the lessors made any representation that lulled them into believing it was not necessary to file an action for specific performance; rather, the evidence was that the lessors made it clear to the association that they would not cooperate but would try to thwart the exercise of the option. The plaintiffs did not tell the defendants a period for exercise and then deny that this was the period, the sort of situation that would give rise to estoppel.
The defendants have argued to the effect that the lessors had a fiduciary duty to advise them and facilitate exercise of the option. The party claiming a fiduciary relationship must plead and prove that the party it characterizes as a fiduciary had a duty to represent its interests. Konover Development Corp. v. Zeller, 228 Conn. 206, 218
(1994). The defendants have proven no facts that would support a finding of such a relationship between it and its members and the lessors.
This court finds that though the unit owners exercised the purchase option on April 2, 1993, and December 16, 1993, dates within the time period when it could be exercised, they failed to bring an action for specific performance within the time prescribed by Conn. Gen. Stat. §47-33a(a). The court further finds that their claim for specific performance is therefore time-barred, and that the limitation period is not tolled by operation of estoppel or other equitable tolling principle.
The lessors note that the association not only failed to initiate its action in a timely manner, but it also failed to file a lis pendens as required by Conn. Gen. Stat. § 47-33a. Because this court has found that the failure to comply with the time limits for bringing an enforcement action bars the claim, it is not necessary to decide whether the failure to file a lis pendens is also an independent bar to the claim. It is also not necessary to decide whether the association's filing not an action for specific performance, but an action for a declaratory judgment in June 1995 comports with the requirements of § 47-33a. The association did not specifically seek specific CT Page 669 performance until it filed its amended counterclaim in April 2000.
IV. Unconscionability of the Leases 
The defendants further assert that even if leasehold condominiums are authorized, as this court concluded in denying the defendants' motion for summary judgment, the leases at issue are unconscionable and unenforceable both at common law and under the standards set forth in Conn. Gen. Stat. § 47-210, which was enacted in 1995, thirteen years after the leases at issue were executed. They raise this claim both as a special defense to the plaintiffs' claims and as the fourth count in their counterclaim, in which they seek a declaratory judgment declaring the leases unenforceable on grounds of unconscionability.
Both in their first special defense to all counts of the lessors' complaint and in their counterclaim for a declaratory judgment, the defendants assert that the leases are unconscionable and "violate public policy pursuant to Conn. Gen. Stat. § 47-210 and [are] therefore unenforceable."
The plaintiffs assert in their eleventh and twelfth special defenses that § 47-210 is unconstitutional if it is construed to impair existing contracts, that it was enacted as a result of admitted lobbying by the defendants and constitutes an unconstitutional private emolument, and that its provisions violate principles of equal protection and due process of law.
The cited statute, Conn. Gen. Stat. § 47-210(a), enacted as Public Acts 1995 No. 95-187, specifically provides that it does not constitute a legislative enactment of a requirement that the courts find certain kinds of leases unconscionable, but that it creates a rebuttable presumption of unconscionability when certain features are present in lease of common elements in condominium projects, subject to rebuttal by the lessor.
This statute provides at Conn. Gen. Stat. § 47-210(b) that "[t]he court on finding as a matter of law that a contract or contract clause was unconscionable at the time the contract was made, may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clauses or limit the application of any unconscionable clause in order to avoid an unconscionable result."
Though subsection (b) indicates that unconscionability is to be assessed at the time the contract is entered into, the statute provides at subsection (d) that: "[a] lease entered into prior to January 1, 1984 pertaining to use of land or facilities by unit owners . . . is presumed to be unconscionable if the lease requires the unit owner to pay annual CT Page 670 rent and other expenses exceeding fifteen percent of the appraised value of the leased property as improved," calculated "during the twelve months immediately preceding the filing of an action under this section." It provides that the calculation of the fifteen percent applies to the appraised value of the leased property "by a licensed or certified real estate appraiser on a date during the twelve months immediately preceding the filing of an action under this section."
Subsection (d)(1) of § 47-210 is concerned with what the Connecticut Supreme Court has termed in Cheshire Mortgage Services v.Montes, 223 Conn. 80, 89 (1992), "substantive" unconscionability, that is, the issue whether the terms of the contract impose oppressive obligations on a contracting party. Smith v. Mitsubishi Motors Credit ofAmerica, Inc., 247 Conn. 342, 350 (1998); Cheshire Mortgage Services v.Montes, supra, 223 Conn. 87 n. 14. At subsection (d)(2), the statute sets forth eight indicia of unconscionability, that are both substantive and procedural. Procedural unconscionability, which is "intended to prevent unfair surprise," may be found based on factors concerning the circumstances of the making of the transaction which concern unequal bargaining power. Smith v. Mitsubishi Motors Credit of America, Inc., supra, 247 Conn. 350; Cheshire Mortgage Services v. Montes, supra,223 Conn. 87-88.
As is discussed in detail below, the common law doctrine of unconscionability looks to the terms of the contract at the time the parties enter into an agreement. A substantively unconscionable bargain is one which "no man in his senses and not under delusions would make on one hand, and . . . no honest and fair man would accept on the other. Humev. United States, 132 U.S. 406, 411, 10 S.Ct. 134, 136, 33 L.Ed 393
(1889)." Doctor's Associates, Inc. v. Jabush, 89 F.3d 109, 113 (2d Cir. 1996). The test is whether "the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." Cheshire Mortgage Services, Inc. v. Montes, supra, 223 Conn. 89.
Statutes are not to be read as altering the common law unless such an intent is clearly expressed. Shaw v. Railroad Co., 101 U.S. 557, 565,25 L.E. 892 (1879); Buckman v. People Express, Inc., 205 Conn. 166, 172
(1987); Stolberg v. Caldwell, 175 Conn. 586, 607 (1978), appeal dismissed, 454 U.S. 958 (1981). The words of 47-210a express no intent to alter the common law and, in fact, they express the opposite intention by noting that "Such lease may or may not be unconscionable in any given case."
Since the common law doctrine of unconscionability relates to the time of entry of the parties into the agreement, the reference at § CT Page 67147-210(d)(1) to the percentage relationship between the rent and the value of the land in the twelve months preceding the filing of an action under § 47-210 must be construed as assuming that suit will be commenced within a year of the parties' entry into the contested contract. To construe the provision otherwise would be to decide that an agreement has become unconscionable with the passage of time, requiring a lessor to adjust the rent if, for example, a fall in land values causes the agreed rent to exceed fifteen percent of the value of the land.
In Cheshire Mortgage Service, Inc. v. Montes, supra, 223 Conn. 91, the Supreme Court indicated that a contract was not substantively unconscionable under the conditions that existed at the time it was entered into would not become unconscionable because of events in the consumers' lives that made the terms onerous. Adhering to the common law principle that unconscionability must be assessed at the time of the transaction, this court must determine whether the plaintiffs have established that the ground rent exceeded fifteen percent of the value of the land when the agreement was entered into in 1982. As assignees, the unit owners may assert that the agreement was unconscionable at the time it was entered into by their assignor, Melrose; however, it is impractical to determine the unconscionability of a lease based on the assignments of fractional interests to subsequent buyers, since to do so would create the fiction that the lessors and all unit owners were entering into a new lease agreement each time a unit changed hands.
Evidence was presented to the effect that the lessors valued the land in 1982 at the rate of $4,000 per unit, or $432,000. The combined rent under the two leases for the first seven years was $34,400, or 7.9% of the value of the land. Section 47-210(d)(1) requires a calculation of the rent and any expenses, such as real estate taxes and maintenance, imposed under a lease in determining whether such expenses exceed fifteen percent. The evidence introduced by the association did not furnish a credible basis for calculating the total cost to the lessee of the lease at the time it was entered into: the defendants have not proven that these costs brought the total to more than $64,800 (fifteen percent of $432,000).
In assessing whether the rent and other costs imposed on the lessees under the leases for years after the seventh year were substantively unconscionable, the court would have to determine whether the increases plus such costs as taxes brought the rent for the later years to levels beyond market rates. The association presented no evidence to establish that the amount of the rent or other terms of the lease for any year covered by the ninety-nine year lease period was not within the range of market rates for such long-term ground leases at the time the agreement was entered into; and the court cannot reach a conclusion that they were CT Page 672 not on the basis of surmise or speculation.
There is a further important factor to be considered in connection with the association's claim of unconscionability. By the terms of the leases, the association has no liability for the ground leases; rather, each unit owner has a duty as an assignee to pay his or her fractional share of the total obligations under the ground lease. No unit member is responsible for the payment of any other unit member. While the association has briefed the issue as though the ground leases made it liable for the total annual rental amounts, the leases do not so provide, nor have the lessors advanced such an interpretation. Since the agreement of each unit member in becoming an assignee is only to pay a fractional amount, it is logical to assess the claim of unconscionability from the perspective of the amount of cost to the individual unit owner, that is, to determine whether a unit owner has been subjected to unconscionable terms, not whether the overall amounts due, for which neither individual unit owners nor the association is liable under the lease, are unconscionable. In other words, since the association is not liable for the obligations imposed under the leases, it has standing only to assert the interests of its members, and each member is liable only for his or her own fractional share, with no obligation to pay any fraction not paid by any other member.
The defendants have not presented any evidence to establish that the amount due from each unit owner as a result of the obligations of the ground leases exceeds customary charges or costs. Though Willis Graham, the association's managing agent, testified that he considered the ground lease "burdensome," he offered no comparisons of the costs at similar complexes. The court was presented with no facts upon which to base a conclusion that the costs are unconscionable. Under Connecticut law, such a determination cannot be made simply by a subjective impression that a contract imposes costs that the obligee finds onerous; rather, the obligations imposed by the contract must be assessed against some objective standard such as prevailing market rate or customary terms.Cheshire Mortgage Services v. Montese, supra, 223 Conn. 93-94.
The defendants presented the testimony of an employee of the Federal National Mortgage Association ("FNMA"), Duane Cooper, who stated his opinion that the terms of the purchase option, as he construed them, did not comport with FNMA guidelines. For several reasons, this testimony cannot be the basis for the relief the defendants seek. First, the leases were tacitly approved, since the project was in fact approved for FNMA mortgage eligibility in 1982. Mr. Cooper's analysis of the applicable standards eighteen years later is less persuasive to the court than the agency's actions at the time of its actual review of the development and its terms. Second, a fair reading of the count of the defendants' CT Page 673 counterclaim in which they seek a declaratory judgment of unconscionability (Count Four) contains no allegation that it is the method of calculating the purchase price that makes the lease unconscionable. Instead, all of the allegations, at paragraphs 1-48, concern the amount of rent and expenses due under the lease, and the schedule for rent increases, with no mention of a claim that the method for calculating the purchase price upon exercise of the option rendered the leases unconscionable.
Construing § 47-210 in a manner that gives effect to its announced intention not to alter the common law doctrine of unconscionability, this court finds that the association has not proven this defense, since it has failed to prove the condition specified at § 47-210(d)(1), a finding that must be made if the court is to make a finding of presumptive unconscionability under § 47-210. Given this failure of proof, it is not necessary .for the court to consider whether the factors set forth in § 47-210(d)(2) have been shown to exist. The court must, however, assess as a separate matter from the consideration of the claimed statutory presumption, whether the leases violate the common law doctrine of unconscionability.
V. Are the Ground Leases Unconscionable at Common Law? 
The General Assembly recognized in § 47-210(a) that leases entered into before the sale of units to the persons who are designated to comply with such leases "may or may not be unconscionable in any given case." The General Assembly noted that in specifying factors to be considered by the court in deciding the issue of unconscionability:
 [i]t is the intent of the General Assembly that this section is remedial and does not create any new cause of action to invalidate any residential common interest community lease but shall operate as a statutory prescription on procedural matters in actions brought on one or more causes of action existing at the time of the execution of such lease.
(Emphasis added.)
The court construes this explanation as recognition that the common law defense of unconscionability continues to be available, and that the final determination whether a lease is or is not unconscionable must continue to be assessed upon those common law principles, which are not supplanted by the rebuttable presumption enacted in § 47-210(d).
In their first special defense to all counts of the complaint, the unit CT Page 674 owners allege both that the leases are unconscionable and that they "violate public policy pursuant to Conn. Gen. Stat. 47-210." The court must therefore determine whether the leases are unconscionable under the common law.
In addressing claims of unconscionability at common law, Connecticut courts have been guided by the provision on the subject in the Uniform Commercial Code, Conn. Gen. Stat. § 42a-2-302, even in cases involving interests in real property rather than personal property.Cheshire Mortgage Service, Inc. v. Montes, supra, 223 Conn. 88-89;Fairfield Lease v. Romano's Auto Service, 4 Conn. App. 495, 498 (1985):
 As Official Comment 1 to § 2-302 of the Uniform Commercial Code suggests, [t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. Hamm v. Taylor, [180 Conn. 491], 495-96. . . . Texaco, Inc. v. Golart, [206 Conn. 454], 462. The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances. Id.
Cheshire Mortgage Service, Inc. v. Montes, supra, 223 Conn. 89.
The cited section of the Uniform Commercial Code provides:
 (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
 (2) when it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.
The question of unconscionability is a matter of law to be decided by CT Page 675 the court based on all the facts and circumstances of the case. FairfieldLease Corp. v. Romano's Auto Service, supra, 4 Conn. App. 498-99;Iamartino v. Avallone, 2 Conn. App. 119, 125 (1984). The test is "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." Emlee Equipment LeasingCorp. v. Waterbury Transmission, Inc., 31 Conn. App. 455, 464 (1993). "Unconscionability generally requires a demonstration of `an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonable favorable to the other party." Id.
The party claiming unconscionability bears the burden of proof. Id.
"The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." Cheshire Mortgage Service, Inc. v.Montes, supra, 323 Conn. 88.
Under the common law standard for unconscionability, the relevant period is the time that the contract was entered into; § 42a-2-302;Cheshire Mortgage Service, Inc. v. Montes, supra, 223 Conn. 89; not the twelve month period prior to the assertion of the claim of unconscionability specified in § 47-210.
Though the nominal lessee, Melrose, played no role in the drafting of the ground leases and was content to let the lessors dictate the terms, a situation that would suggest procedural unconscionability, the transaction that the unit owners are actually complaining of is their agreement to become assignees of those existing obligations. The court finds that the defendants have not proven procedural unconscionability with regard to the unit owners' entering into the transactions that obligated them under the lease.
Though the three unit owners who testified, Tyrone Griffin, Dwayne Bell, and Wallace Roberts testified that they were unaware when they bought their units that the purchase obligated them to pay rent under the ground leases, the fact that each unit was located on land that was leased, not owned, by the condominium association was in fact set forth in the only sales contract presented. That contract, which related to Mr. Roberts's purchase, clearly stated the obligation of each unit owner to pay a pro rata share of the rent:
c. Buyer understands that the land upon which the buildings are situated will be leased under a 99 year net lease which lease will require the buyer to pay, as his pro-rata share a monthly rental with an CT Page 676 escalator clause for the future rental; the terms of which are set forth in the submission documents, a copy of which the Buyer has received.
The deed by which Mr. Roberts acquired his unit likewise clearly stated that he was acquiring the unit and "all of the right, title, and interest of the Grantor in and to a .88 (%) percent and fractional interest in and to a certain leasehold estate created pursuant to the terms and conditions of a certain Ground Lease by and between Richard A. LoRicco, et als and Melrose Apartments, Inc. dated the 30th day of November 1982 and recorded in the land Records of the Town of West Haven. . . ." (Exh. 98.)
Mr. Roberts was represented by counsel when he purchased his unit.
The "submission documents" referred to in the contract, that is, the public offering statement, contain the lease and the statements of the rent due for each year. The lease is recorded on the land records, and is clearly identified in the deed.
Significantly, the unit owners did not present in evidence any of the contracts, deeds, closing statements, or other documents related to their acquisition of units. They did not present testimony to establish their claim of surprise that they had agreed to pay portions of the ground lease. (The contract and deed discussed above were introduced by the plaintiffs.) The court has no basis to conclude that the contracts and deeds and disclosures did not identify the lease obligation, especially since the transaction documents cited above identify it quite clearly. The court infers, rather, that the plaintiffs did not present such documents at trial because they would not have supported their claim that they were not made aware of the obligation to pay a fraction of the ground rent. While each unit owner was obviously not able to renegotiate the terms of his or her fractional share of the ground lease, the defendants have not established that buyers were in any way prevented from knowing what those terms were so that they could make an informed decision whether to purchase a unit that included ground rent and the other obligations of the lease as an added expense. The court, therefore, finds that the unit owners have not proven procedural unconscionability.
The ground leases provided for no increases whatever for the first seven years. Each lease provides for annual increases thereafter, specifying rents through the fifteenth year (increasing by $3,888 in most of those years, an increase to be divided among the 54 fractional interests), but then adopting a calculation that in effect adopted a cost of living increase derived from the federal consumer price index. The CT Page 677 defendants mistakenly interpreted this formula as creating the possibility of annual increases of 30%. A correct calculation based on the formula set forth in the leases (the 1996 rent multiplied by a fraction that has the current year's consumer price index as the numerator and the consumer price index for 1996 as the denominator) indicated, in a sample calculation based on the indices for 1998, a $2,840 increase to be divided among the 54 unit owners of the building to which the lease applied.
The managing agent for the condominium, Mr. Graham, testified that the complex and its unit owners had been so burdened by the ground lease obligations that they found it impossible to pay both common charges and ground rents to keep the housing affordable. This conclusory statement was not supported by evidence. Tyrone Griffin, the only witness who testified about the actual amounts paid, testified that at the time of trial his total common charges, including his portion of the ground rent, were $211 per month for a two-bedroom apartment. No evidence was produced to establish that this amount exceeded common charges for similar condominium units.
Mr. Graham testified that the common areas were in a deplorable state of repair because the condominium association could not charge higher common charges. Though the unit owners assert that this situation is attributable to the ground leases, it is highly likely that it is caused by their reluctance to charge themselves more common charges. Mr. Griffin's testimony concerning his mortgage payments and common charges indicate that his current cost for housing in a two-bedroom apartment is approximately $600 per month, up from approximately $536 in 1992, when common charges totaled $156 per month, inclusive of the ground rent.
Again, it is significant that no unit owner is responsible for payment of any portion of the ground rent other than his or her own fractional share. Accordingly, if some unit members fail to pay, or if some units are vacant, the lessors, not the other unit owners, bear the loss of rent. This risk to the lessors that not all of the fractional shares of the ground rent will be collected is a factor which this court has considered in assessing whether the ground leases are substantively unconscionable.
No evidence was presented to indicate that the costs imposed on unit owners under the ground leases were excessive either as compared to other ground rents or as compared to the overall costs of similar housing in the same market. It must be noted that if the condominium association owned the land, unit members including Mr. Griffin would still pay their share of real estate taxes, and the assumption that the overall cost of his housing would decrease is not accurate. His purchase price, and CT Page 678 therefore his mortgage, would logically have been higher if a fraction of the land value had been included.
The Supreme Court has indicated in Cheshire Mortgage Services, Inc. v.Montes, supra, 23 Conn. 91-94 that a purchaser's inability to pay the amount due under a contract does not alone render the contract unconscionable.
The unit owners assert that the value of their units has fallen precipitately because the units occupy leased land and because of the level of the ground rents. The causal connection has not been proven, and it is not a conclusion that the court finds is a logical inference. Many other factors, including a supply of newer condominium units in the area and the neglected appearance of the common areas because of deferred maintenance could account for the fall in value.
Though the unit owners have shown that at the time they bought their units and became assignees under the lease they had no opportunity to renegotiate its terms, they have not shown that they were impeded from determining the costs imposed before they decided to buy units, or that the amounts charged to each unit owner are so in excess of prevailing ground rents or prevailing unit expenses as to be unconscionable. They offered no testimony to establish that the ground rents in the leases at issue are higher than customary rates for ground rents, nor that the impact of the ground rents results in an above-market cost per unit for housing. The court cannot simply accept the defendants' view that the ground rents are too high and that they are therefore unconscionable. Rather, the burden of proving unconscionability is on the defendants, who have failed to adduce evidence that would support a finding either of procedural or substantive unconscionability.
The unit owners have failed to establish that their obligations as assignees are unconscionable under the common law doctrine of unconscionability.
In view of the court's determinations concerning the claim under §47-210, it is not necessary to address the plaintiffs' constitutional challenges to that statute.
VI. Defense of Equitable Estoppel 
The association asserts as its second special defense that the lessors are equitably estopped from asserting that the option to purchase was not exercised because they were uncooperative with regard to the association's attempts to exercise it. The defendants did not prove that the lessors identified a period for exercise and then denied that it was CT Page 679 correct, the sort of conduct that would give rise to estoppel. As has been discussed above, the association's remedy for the alleged failure to give effect to the exercise of the option was to bring a timely action for specific performance. The court cannot, under the guise of exercising equitable powers, excuse a party from exercising a statutory remedy during the statutory period.
VII. PLAINTIFFS' CLAIMS 
Having determined that the defendants' claim for specific enforcement of the purchase option is barred because it was not timely filed, that the ground leases were not proven to be wither illegal or unconscionable, and that the other defenses asserted by the defendants do not bar their enforcement, the court turns to the merits of the lessors' claims.
A. Failure to Collect and Remit Collected Ground Rents 
In the first count of their complaint, the lessors allege that the Oaks Condominium Association has breached its obligation under the ground lease to collect and remit to the lessors the fractional rents owed by unit owners. Specifically, the plaintiffs allege that the Association and its board of directors failed to pay the lessors all the rents collected, made an unauthorized deduction as a credit in March 1993, failed to pursue delinquent unit owners with sufficient diligence, failed to notify mortgagees of defaults in payment of ground rents by unit owners, and failed to account to the lessors for funds eventually collected from delinquent unit owners.
Paragraph 5 of the ground leases provides:
The parties agree that the board of Directors of the Condominium or its designee shall be and hereby is designated as the agent of the Parties hereto to collect, remit and make the Annual Rental Payments and the payments described in paragraph 4 hereof. The liability of the condominium Unit Owners for all of the foregoing payments shall be common to all, and the Board of Directors shall collect the same from the Condominium Unit Owners as Common Charges as the term is or shall be defined in the Declaration and By-Laws as aforesaid, and the Board of Directors shall have such rights to collect the same as may be set forth in said Declaration, By-Laws or the Unit Ownership Act . . . Paragraph 4, which is cited in the provision set forth above, required unit owners to pay real property CT Page 680 taxes, insurance, repairs and maintenance associated with the use and ownership of the land.
Article 22(i) of the Declaration requires the association to provide notice of default in common charge payment "or any other default" to the first mortgagee of the applicable unit. Article V, Section 3 of the by-laws requires the board of directors to "take prompt action to collect any common charge due from any unit owner which remains unpaid for more than thirty (30) days from the due date for payment thereof." Article IX, Section 1 requires the board or the managing agent to keep a separate account of the assessments due and paid by each unit owner.
The lessors proved that since 1995, the defendants have not remitted to them the fractional shares of the ground rents collected from unit owners, but that they have instead deposited those amounts in an escrow account, awaiting a decision on their claim that these rents were not due because the ground leases were unenforceable. The amount of the ground rents in the escrow account was represented to be $401,000 as of May 31, 2000. A financial statement concluding a reporting year that ended on May 31, 2000 (Exh. 107), states that a further $171,000 regarding the ground rents is an "unfunded liability," apparently meaning that this amount was either not deposited in the escrow fund or was expended from it. The association's managing agent testified that such funds have been used to buy carpeting and to pay counsel fees associated with this litigation.
The association and its managing agent have had a practice over the years of budgeting the amount of the ground rents due as the entire amount specified in the leases, without deducting amounts not paid by defaulting unit owners. As has been noted above, the association had no obligation to pay ground rents not paid by unit owners. The testimony was not clear as to whether the funds escrowed represent one hundred percent of the rents specified in the leases, or only the amounts actually paid by unit owners. For that reason, it is unclear whether the lessors are entitled to all the escrowed amounts as damages. The determination of the amount of damages due must await the accounting ordered below.
The plaintiffs claim that the defendants failed to remit all ground rent payments collected before 1995, and specifically that they declared in a letter dated March 17, 1993 (Exh. 25), that they were taking a credit of $19,531 that they had found were amounts that had not actually been collected because some unit owners had defaulted on their obligation to pay ground rents. It appears that the defendants' practice before 1993 had been to calculate the ground rents in their budgets and in their early remittances to the lessors, as though the collection rate were 100%. The March 17, 1993 letter represents a correction to reflect deduction of ground rents not paid by unit members, since neither the CT Page 681 other unit members nor the association was liable for the unpaid ground rents of other unit owners. The March 17, 1993, letter is accompanied by a list showing each unit with delinquencies in ground rent payments by month and year, and the amount of the resulting deductions. The court finds that this communication constitutes a sufficient explanation, and the lessors have not proved it to be inaccurate. The plaintiffs have failed to prove that the defendants failed to remit ground rents paid by unit members before 1995.
The plaintiffs take the position that if the managing agent had been more aggressive in pursuing collection, by notifying mortgagees of defaults in payments of ground rents and by bringing more foreclosure and collection actions, more of the delinquencies would have been recovered. The evidence does not support this surmise. Mr. Graham's records on behalf of the association indicate that the association referred numerous accounts to several collection lawyers on a contingent fee basis. The plaintiffs have not discharged their burden of proving that further efforts would have increased collections, nor have they demonstrated the amounts that could have been recovered by such efforts. Mr. Graham admitted that the proceeds of some collection efforts had been wholly used to pay back real estate taxes, however, the amount of those recoveries that represented fractional shares of ground rents was not established, and the court has no basis for arriving at those amounts.
The plaintiffs presented uncontradicted evidence that the defendants have failed to pay real estate taxes attributable to the land that is the subject of the ground lease. That obligation is clearly stated in the lease, cited above. The court finds that the amount due for unpaid back taxes which the association was required to pay under the lease terms is $82,115.91.
B. Negligence 
In the second count of the third amended revised complaint, the plaintiffs allege that the defendants were negligent in their collection efforts. As has been stated with regard to the assertion that such contract constituted a breach of contractual obligations, the plaintiffs have failed to prove any specific amount of damages suffered as a result of the claimed nonfeasance and misfeasance.
C. Action for Accounting 
The ground leases provide that "the parties agree that the Board of Directors of the Condominium or its designee shall be and hereby is designated as the agent of the parties hereto to collect, remit and make the Annual Rental payments and the payments described in paragraph 4 CT Page 682 hereof." The unit owners are parties to the lease by assignment. The evidence established that the board of directors designated its managing agent to collect the rents from the unit owners and remit them to the lessors and that he did so until the agreement that rents collected would instead be held in escrow.
The defendants have not contested the availability of an action for accounting with regard to the rents. The Connecticut General Statutes, at §§ 52-401 through 52-405 provide a statutory action for an accounting. An accounting may be ordered when a party has some legal obligation to another party to collect or hold assets in which the other party has an interest. 1 Am. Jur.2d Accounts and Accounting § 54; 1 C.J.S. Accounting § 2. That obligation may arise from a party's status as a fiduciary, as a partner, or from the existence of jointly-owned assets. Weidlich v. Weidlich, 147 Conn. 160 (1960);McDonald v. Hartford Trust Co., 104 Conn. 169 (1926); Donohue v. Barnes, 6 Conn. Cir. 64, cert. denied, 158 Conn. 656 (1969).
The circumstances of the controversy over the ground rents, and the evidence that the defendants have not acted strictly on the lessors' behalf with regard to stewardship of ground rents collected since July 1995 but has expended funds from an escrow account created as a repository of ground rent payments, lead this court to conclude that an accounting is warranted with regard to ground rent collections from January 1, 1995 to the present. Within thirty days of the date of this ruling, the parties shall file written proposals as to a person to be appointed an auditor to complete the process set forth in § 52-402.
The accounting shall include an accounting of all rents received from January 1, 1995, to date including, but not limited to those now held in the escrow fund. No expenditures shall be made from that fund until further order of this court.
D. Conversion 
In the fourth count, the plaintiffs characterize the defendants' failure to remit ground rents collected as conversion.
The elements of a claim for conversion are as follows:
1) the funds at issue belonged to the plaintiff;
2) the defendant deprived the plaintiff of its funds for an indefinite period of time;
3) the defendant's conduct was unauthorized; CT Page 683
4) the defendant's conduct harmed the plaintiff
Aetna Life Casualty Co. v. Union Trust Co., 230 Conn. 779, 790-91
(1994); Falker v. Samperi, 190 Conn. 412, 418-19 (1983); DiscoverLeasing, Inc. v. Murphy, 33 Conn. App. 303, 309 (1993).
The practice of putting ground rents in escrow rather than paying them to the plaintiffs arose because of the dispute concerning whether the defendants had actually exercised the option to purchase the land. If they had been found to have instituted a timely action for specific performance, and if specific performance had been granted, they would have had no obligation to pay ground rents after the date of exercise of the option. The decision to escrow the disputed funds was reached under the supervision of the court, DeMayo, J., apparently with the acquiescence of the plaintiffs. To the extent that the defendants have, as they concede, taken monies out of escrow to meet current needs, they have not been shown to have thereby become unable to pay the full amount of the rents received upon adjudication of the plaintiffs' claims by this court. This court therefore does not conclude that the plaintiffs have been damaged or that punitive damages are warranted.
F. Violation of CUTPA 
The plaintiffs claim that the defendants' use of the ground rents for other purposes constitutes a violation of the Connecticut Unfair Trade Practices Act. That act prohibits unfair or deceptive practices in the conduct of a trade or business. Conn. Gen. Stat. § 42-110(a). The terms "trade" and "commerce" are defined in the Act as follows:
 "Trade" and "commerce" means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.
Conn. Gen. Stat. § 41-110a(4).
The defendants are not engaged in a trade or business of leasing property or providing services to the lessors; rather, the defendant members of the board of directors are parties on whom the leases imposed duties to collect ground rents and remit them to the lessors.
The conduct complained of was not performed in "trade" or "commerce" as defined in CUTPA, and the remedies provided by that statute are therefore CT Page 684 not applicable.
VIII. COUNTERCLAIMS 
A. Quiet Title 
The first count of the defendants' counterclaims is an action to quiet title to the land that is the subject of the ground leases. The defendants claim an interest in the land on the basis that leasehold condominiums are not authorized by law, and that they therefore acquired title to the land as part of the declaration of the condominium, despite the clear exclusion of the land from that declaration. In its memorandum of decision dated October 11, 2000, denying defendants' motion for summary judgment, this court has rejected the legal argument on which this claim is based. The court adopts the analysis of the issue as set forth in that ruling, in which the court concluded that the Condominium Act authorized leasehold as well as fee simple condominiums.
The court finds that the defendants have failed to establish that they have even a colorable ownership interest in the land that is the subject of the leases at issue in this case, and their claim to quiet title in their favor is denied.
B. Unjust Enrichment 
In the second count of their counterclaim, the defendants claim that the plaintiffs were unjustly enriched by their receipt of ground rents after 1987, on the basis that the Condominium Act required the fee to the land to be conveyed to them within five years. This court's reasoning in rejecting the claim that the leasehold condominiums are not authorized has been set forth in the court's ruling of October 11, 2000, and the court adopts the reasoning therein and finds that the defendants have failed to establish their claim for unjust enrichment.
C. Action for Specific Performance 
As has been detailed above, the defendants' action for specific performance of the exercise of the option is barred because it was not brought within eighteen months of December 16, 1993, the last date that the defendants allege to have exercised it within the period that the court has found to be the applicable period for exercising the option.
D. Breach of Duty of Good Faith and Fair Dealing 
The defendants allege that the plaintiffs breached their duty to act in good faith and to deal fairly with regard to the defendants' efforts to CT Page 685 pursue the option to purchase the land. Specifically, the defendants claim that the plaintiffs failed to "convey their view of the purchase option period to the defendants so that defendants could properly exercise same; failed to obtain an appraisal in aid of negotiations over exercise of the option; failed to submit to arbitration, and refused to renegotiate the terms of the lease to make it less burdensome.
There is a duty to act in good faith and to deal fairly with the other party to a contract, Gupta v. New Britain General Hospital, 239 Conn. 574,598 (1996); Warner v. Konover, 210 Conn. 150, 155 (1989). This duty requires that "neither party do anything that will injure the right of the other to receive the benefits of the agreement." Gupta v. New BritainGeneral Hospital, supra, 239 Conn. 598; Habetz v. Condon, 224 Conn. 231,238 (1992). The defendants construe this duty beyond the definition set forth above. They urge that it imposes a duty to act on the other party's behalf and to waive limitations and advantages stated in the contract. The cases cited above do not support this construction of the duty of good faith and fair dealing, and the defendants have provided no precedents in support of their interpretation.
The arbitration provision in the leases related solely to the issue of the price to be paid after an option to purchase was exercised. The defendants sought instead to force the plaintiffs to arbitrate disputes concerning claimed underpayments of the ground rent, a topic not covered by the arbitration clause. It is well established that a party has no obligation to arbitrate any issue that he or she has not agreed to arbitrate; White v. Kampner, 229 Conn. 465, 473 (1994); John A.Errichetti Associates v. Boutin, 183 Conn. 481, 488 (1981). A refusal to forego their rights to have disputes other than the value of the land decided by a court rather than by an arbitrator does not constitute a breach of a duty that the plaintiffs owed to the defendants under the lease contract.
This court is likewise not prepared to consider a refusal to renegotiate the terms of a contract because the other party finds them onerous to be a breach of duty. Good faith and fair dealing do not require a total relinquishment of a party's own interests.
The plaintiffs' refusal to obtain an appraisal at the juncture favored by the defendants is likewise not a breach of the duty alleged. The defendants clearly hoped to have advance notice of the plaintiffs' view of the value of the land before risking a binding adjudication by an arbitrator. While it would have been advantageous for the defendants to know the plaintiffs' position in advance of the arbitration hearing, the plaintiffs had no duty to incur the expense of obtaining an appraiser until they were quite certain that the defendants were going to proceed CT Page 686 with the pursuit of the option. The association had sent the plaintiffs letters that could reasonably have been construed as a testing of the waters, an exploratory effort to consider whether buying the land was actually advantageous. The plaintiffs did not have an obligation to assist the association with its decision.
The court finds, however, that the plaintiffs' conduct with regard to the issue of the time to exercise the option was a breach of the duty of good faith and fair dealing. The plaintiffs certainly had a position about when the option could be exercised, and one of the offers from the defendants was within that period. Nevertheless, the plaintiffs indicated that if the association proceeded to arbitration to fix the price, they would take the position that the exercise had not occurred during the twelve-month period specified in the lease, creating the prospect that the association would undergo the expense of arbitration only to find that their exercise was either premature or late.
The lessors' intimation that they would cause the association to engage in multiple and potentially fruitless proceedings caused the defendants to incur additional legal costs, as Attorney Small was obliged to engage in epistolary jousting with the plaintiffs and additional consultations to try to determine haw to respond to the lessors' conduct. On the basis of a review of Attorney Small's billing records, (Ex 512) the court finds that the defendants suffered damages in the amount of $3,450.00 as a result of the plaintiffs' breach of the implied covenant of good faith and fair dealing.
E. CUTPA 
The defendants' CUTPA claim against the plaintiffs is based on claims of breach of contract, specifically, the same allegations of breach of the implied duty of good faith and fair dealing that is the subject of Count V of the counterclaim. The defendants also raise as CUTPA claims the claim of unconscionability that the court has rejected above.
The claim of breach of the duty of good faith and fair dealing is a claim of breach of an implied term of the lease contract. It is well established that breach of a contractual duty, without substantial aggravating circumstances, does not constitute a violation of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). Bartolomeo v. S.B.Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989); United Roasters,Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir.), cert. denied, 454 U.S. 1054 (1981). Conn. Gen. Stat. § 42-110b(b) provides that in interpreting CUTPA, Connecticut's courts shall be guided by interpretations given by federal courts and the Federal Trade Commission to Section 5(a)(1) of the Federal Trade Commission Act. See EmleeCT Page 687Equipment Leasing Corp. v. Waterbury Transmission, Inc., supra, 41 Conn. Sup. 580. The defendants' position would signal that every breach of the duty of good faith and fair dealing is also a CUTPA violation. In view of the reluctance of appellate courts to construe breach of contract claims as per se violations of trade legislation statutes, this court finds that the defendants have not proven a CUTPA violation.
IX. Attorney's fees 
The plaintiffs seek an award of attorney's fees against the defendants. A party cannot recover attorney's fees in the absence of statutory authority or a contractual provision by which a party agrees to pay fees in the event of a breach. Doe v. State, 216 Conn. 85, 106
(1990); Marsh, Day Calhoun v. Solomon, 204 Conn. 639, 653 (1987). The plaintiffs have not identified any applicable statute that provides for recovery of fees. They apparently base this claim on the lease itself, which provides that an individual unit owner whose fractional interest in the lease is terminated because of default of the obligation to pay his or her fractional share of rent shall pay the lessors' attorney's fees (Ex. 3, p. 16). The association is not, however, a party to the lease. Rather, the lease is a contract between the lessors and Melrose, which assigned fractions of its rights and obligations to unit members. The individual defendants are sued in their capacity as members of the board of directors of the association, and the lessors have not alleged that any of them is in default of any obligations as assignees of fractional interests in the lease.
The plaintiffs have failed to establish any basis for the recovery of attorney's fees from the defendants.
Since this court has found that the lessors' breach of the contractual duty of good faith and fair dealing does not also constitute a CUTPA violation, the defendants have established no basis for a recovery of fees.
X. Conclusion 
The defendants have failed to establish that condominiums including long term land leases are illegal. They have also failed to prove their claim of valid exercise of the option to purchase the land that is the subject of the ground leases. The April 2, 1993, and December 16, 1993 offers were within the period during which the option could be exercised; however, the claim is barred by failure to bring an enforcement action within eighteen months of those dates as required by § 47-33a. The May 4, 1994 offer was outside the option period, was CT Page 688 not alleged to constitute an exercise in the declaratory judgment counterclaim filed in June 1995, and proposed terms different from the terms of the option.
Judgment shall enter in favor of the plaintiffs on the defendants' claim for specific performance of the option and on the claim to quiet title to the land at 79 and 80 Claudia Drive in West Haven.
The plaintiffs have proved entitlement to damages in connection with the claims they make in the first count. Damages in the amount of $82,115.91, the amount of unpaid taxes, have been established, and are hereby awarded. Damages for ground rents collected but not paid will be calculated after an accounting. The court enters a judgment for an accounting of ground rents that the association actually collected from unit members from January 1, 1995, to the present that it did not remit to the plaintiffs. The parties shall file written proposals within thirty days proposing a neutral person or persons to act as auditor to conduct the accounting.
The court finds that the plaintiff lessors are liable to the association for $3,450 for breach of the duty of good faith and fair dealing.
The defendants, their agents, servants and employees are hereby enjoined from making any expenditures from the escrow account established as a repository for ground rents, and are ordered to deposit all ground rents collected from unit members hereafter into that escrow fund until further order of the court.
Beverly J. Hodgson, Judge of the Superior Court